IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CAMERON LEWIS,<br><br>v.<br><br>KEVIN CARABALLO, *et al.* | Civil No. CCB-21-1872 |

**MEMORANDUM**

The plaintiff Cameron Lewis filed a seven-count complaint against Trooper First Class Kevin Caraballo, individually and in his capacity as a Maryland State Police Officer, and the Maryland Department of State Police ("MSP"). Lewis's complaint alleges defendants subjected him to excessive force and denied him access to the courts in violation of the United States and Maryland Constitutions; civil conspiracy in violation of the Maryland Constitution; and battery and intentional infliction of emotional distress under state tort law.

Now pending before the court is Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment. (ECF 21). The motion is fully briefed and no oral argument is necessary. For the reasons explained below, the court will grant the motion of MSP and Trooper Caraballo in his official capacity and will grant in part and deny in part the motion of Trooper Caraballo in his individual capacity.

**BACKGROUND**

The plaintiff, Cameron Lewis, is a biracial male with a documented mental health condition who, at the time of the incident giving rise to this suit, was fifteen years old and lived in Greensboro, Maryland. (Compl. at ¶ 2, ECF 1). Defendant Kevin Caraballo is a Trooper First Class

1

with MSP. (Corrected Decl. of Kevin Caraballo at ¶ 1, ECF 38-1). Defendant MSP is the state police department for the state of Maryland. (ECF 1 at ¶ 10).

This case arises from a physical encounter between Lewis and MSP troopers in July 2018. The complaint states that as a result of the encounter, Lewis experienced pain and suffering, temporary and permanent physical injuries, and severe emotional distress and post-traumatic stress disorder. (*See, e.g.*, ECF 1 at ¶¶ 25, 47, 51). The following account draws on the complaint, an affidavit submitted by the defendants, and the body worn camera ("BWC") footage of one officer, also submitted by the defendants.

### I. MSP Responds to Police Report Regarding Lewis

On July 28, 2018, Lewis's mother, Crystal Lewis, contacted MSP to file a domestic violence report against her son, Cameron Lewis. (*Id.* at ¶ 2). The defendants, through the affidavit of Trooper Caraballo, submit that at the time of the report, the incident was "active" and "physical." (ECF 38-1 at ¶ 2).

Trooper Caraballo was the first officer to arrive at the Lewis residence in Greensboro, Maryland. (*Id.* at ¶ 3). Upon arriving, Trooper Caraballo observed Cameron Lewis pacing on a sidewalk outside the Lewis's apartment complex, and Ms. Lewis crying on the front steps. (*Id.* at ¶¶ 3-4). Trooper Caraballo's affidavit states that he first approached Ms. Lewis, who informed him that her son had physically assaulted her. (*Id.* at ¶ 4).

### II. MSP Troopers Engage Lewis

Trooper Caraballo's affidavit continues to attest that, after speaking with Lewis's mother, he approached Lewis. (*Id.* at ¶ 5). In response, Lewis clenched his fists, assumed a "fighting stance," and shouted "yo get the fuck away from me." (*Id.*). Trooper Caraballo continued

attempting to talk with Lewis, but Lewis reassumed his fighting position and repeated his yells. (*Id.*).

At this point, Sergeant Glenn Ray of the Greensboro Police Department arrived. Exhibit B to the defendants' motion contains Segreant Ray's "BWC" footage which captures much of the remainder of the encounter. (ECF 21-3).

When Sergeant Ray arrives, Trooper Caraballo can be seen speaking to Lewis, with Lewis backing away from Trooper Caraballo and telling the officer not to touch him. (*Id.*).[1] Sergeant Ray rapidly approaches, asking, "what's going on?" (*Id.*). Lewis responds, "y'all tryna touch me," and continues to back away from the officers along a sidewalk bordering an adjacent parking lot. (*Id.*). As Lewis backs further along the sidewalk he continues telling the officers not to touch him. (*Id.*). Lewis then moves off the sidewalk, backing into the lot between two parked vehicles, and shouting "get the fuck away from me" at the officers, who continue advancing toward him. (*Id.*).

As Lewis backs past the cars and toward the center of the parking lot, Sergeant Ray extends an arm toward Lewis and orders him to "stop" for the first time. (*Id.*). In response, Lewis abruptly clenches his fists and bends his knees, quickly but briefly assuming a fighting position and shouting "ain't nobody fucking playing with you." (*Id.*). Sergeant Ray tells Lewis, "I'm not gonna be scared by that," and again asks, "what's going on?" (*Id.*). At this point, Lewis begins to walk away from Sergeant Ray, turning his back on him for the first time. (*Id.*). Trooper Caraballo, who had been following along Sergeant Ray's left flank, matches Lewis's pace and strides alongside him as Lewis walks away. (*Id.*). After just a few paces, Lewis turns back toward Sergeant Ray, resuming his hostile, clenched-fist stance and repeating his demand not to be touched. (*Id.*).

---

[1] Pinpoint citations are omitted because the video does not provide time markers.

In response to Lewis's latest outburst, Sergeant Ray threatens to use force for the first time. (*Id.*). Sergeant Ray tells Lewis, "I'll tase you, I don't care how old you are," and points his taser at Lewis. (*Id.*). Sergeant Ray then orders Lewis, "stop, put your hands behind your back." (*Id.*). Lewis says "no," and Sergeant Ray again commands Lewis to put his hands behind his back. (*Id.*). Lewis responds "why?" to which Sergeant Ray replies "do it now." (*Id.*). Lewis asks "why?" again, and again shouts "y'all don't touch me." (*Id.*).

### III. MSP Troopers Arrest Lewis

After Lewis's refusal to put his hands behind his back, the officers initiate a forceful arrest. Without verbal cue, Sergeant Ray and Trooper Caraballo simultaneously lunge toward Lewis, grabbing him by the front of his shirt and shoving him backward. (*Id.*). The officers force Lewis back, out of the parking lot, onto a grassy island bordering the lot, and up against a row of hedges. (*Id.*). The video at this point is interrupted intermittently by Sergeant Ray's proximity to Lewis's body. (*Id.*). The next clear image is of Trooper Caraballo on the ground, using his weight to drag Lewis down while Sergeant Ray pushes from above. (*Id.*). This successfully brings Lewis to his hands and knees, and Sergeant Ray is then able to force Lewis the rest of the way to the ground, facedown. (*Id.*). The BWC then becomes obscured by Lewis's body once again, but Trooper Caraballo's affidavit states that around this time, he "executed three (3) elbow strikes to the back of Mr. Lewis' shoulder area." (ECF 38-1 at ¶ 10).

When the BWC becomes unobstructed, Lewis is still on hands and knees with his face down. (ECF 21-3). In the plaintiff's description, Trooper Caraballo, who at this point is crouched on Lewis's left side, is holding Lewis's "head in his hands like a football, face down and forcibly kneeing [Lewis] in the head." (ECF 1 at ¶ 4). Trooper Caraballo's affidavit differs, characterizing

4

the "knee strikes" as instead connecting with Lewis's "left rib area." (ECF 38-1 at ¶ 11). Trooper Caraballo then stands and moves from Lewis's lefthand side to his front. (ECF 21-3). At this point, the BWC shows Trooper Caraballo adopting a boxer-like stance and punching downward at Lewis approximately five times, connecting somewhere in the region of the back of Lewis's head or left shoulder. (*Id.*). The BWC does not show definitively how many times Trooper Caraballo struck Lewis, or precisely where his blows landed, but Trooper Caraballo's affidavit states he "executed five (5) closed fist strikes," or "face strikes," "striking Mr. Lewis 4 total times in the head area." (ECF 38-1 at ¶¶ 11-12).

The plaintiff describes this portion of the arrest as a "brutal attack" in which Trooper Caraballo is "punching [Lewis] in the head with powerful alternating swings from his right fist to his left fist into the sides [of Lewis's] head." (ECF 1 at ¶ 4). The complaint alleges "Trooper Caraballo punched Cameron in the head so hard that he fractured his own hand during the punches" and had to wear "a cast for several months after the incident." (*Id.* at ¶ 4).

As Trooper Caraballo executed "face strikes" to Lewis's "head area," (*see* ECF 38-1 at ¶¶ 11-12), Sergeant Ray tased Lewis, (*see* ECF 21-3). The sound of the taser discharging, though not visible, can be heard in the BWC video. (*See id.*). The complaint alleges the "taser barb embedded itself in Cameron's skin, but did not incapacitate him." (ECF 1 at ¶ 16). Trooper Caraballo's affidavit states he was unaware Sergeant Ray was simultaneously tasing Lewis. (ECF 38-1 at ¶ 12).

Throughout the arrest, Lewis can be heard yelling in pain and protest and can be seen struggling with the officers. (ECF 21-3). The plaintiff characterizes this as a natural response to being tackled, tased, and punched, (*see* ECF 1 at ¶ 17), whereas Trooper Caraballo characterizes Lewis as resisting arrest, (ECF 38-1 at ¶¶ 10-12). The plaintiff also alleges that when Trooper

Caraballo began striking him, Lewis "had already been tased," had his arms behind his back, and was "handcuffed and restrained by two other officers." (ECF 1 at ¶¶ 18, 56). The BWC appears to show that Lewis was tased after the first one to two head strikes; it is inconclusive as to the position of his hands, the degree to which he may have been handcuffed, and the involvement of a third officer. (*See* ECF 21-3).

After Sergeant Ray engages Lewis with the taser, Lewis becomes compliant and Trooper Caraballo ceases applying force. (*Id.*). The officers simultaneously order Lewis to place his hands behind his back, which he does, and the officers complete successfully handcuffing him. (ECF 38-1 at ¶ 12). As they do, Lewis yells repeatedly, "you hurt my shoulder." (ECF 21-3). At this point, a third officer is visible entering the scope of the BWC to assist Trooper Caraballo and Sergeant Ray. (*Id.*).

## IV. MSP's Internal Investigation

The complaint alleges that after the incident, MSP conducted an internal investigation of Trooper Caraballo's use of force on Lewis and reached a "false conclusion." (ECF 1 at ¶¶ 27-28). Specifically, the plaintiff alleges MSP conducted an internal investigation and determined that Trooper Caraballo engaged in no wrongdoing. (*Id.* at ¶ 27). The plaintiff faults the investigation for failing to contact Lewis or his family to obtain Lewis's version of events and assess his injuries, for ignoring the evidence contained in Sergeant Ray's BWC footage, and for failing to share the results of the investigation with the Lewis family and their counsel despite representations that the results would be disclosed. (*Id.* at ¶¶ 27-28). The complaint also alleges that Trooper Caraballo brought false charges of assault and malicious destruction of property against Lewis related to damage to Trooper Caraballo's glasses during the altercation, when in fact the glasses "flew off"

Trooper Caraballo's face as he was arresting Lewis. (*Id.* at ¶¶ 28, 54). Trooper Caraballo's "fabricat[ed]" charges, the plaintiff claims, "contaminated the internal investigation process, causing or contributing to its wrongful conclusion." (*Id.* at ¶¶ 28, 55).

The plaintiff claims the allegedly defunct investigation protected Trooper Caraballo from criminal prosecution or from other accountability for his actions and "deterred" the State's Attorney's Office from convening a grandy jury to investigate Trooper Caraballo, "effectively insulat[ing] him from prosecution." (*Id.* at ¶¶ 27, 29).

**V. Lewis's Injuries**

The complaint alleges Lewis suffered numerous injuries due to his encounter with MSP. Specifically, he alleges he experienced "conscious pain and suffering, mental anguish, emotional distress, and both temporary and permanent physical damage and injury to his person." (*See, e.g.*, *id.* at ¶ 47). He also states the encounter caused him "severe emotional distress," and that it exacerbated his post-traumatic stress disorder. (ECF 1 at ¶ 51). Finally, Lewis alleges he was wrongly detained in a juvenile detention facility as a result of Trooper Caraballo's allegedly fabricated and retaliatory claims against him, and that he was denied access to legal redress because of the contrived internal investigation. (*Id.* at ¶¶ 54, 57).

On July 27, 2021, Lewis filed this suit against Trooper Caraballo and MSP. (ECF 1). The defendants moved to dismiss or in the alternative for summary judgment, (ECF 21), later clarifying their motion should be treated as a 12(b)(6) motion to dismiss as to "the access to courts and legal redress claim, the civil conspiracy claim, the intentional infliction of emotional distress claim, and the fact that MSP and [Trooper] Caraballo in his official capacity are not proper defendants," and a motion "for summary judgment for all of the claims related to excessive force." (Defs.' Reply at 4 n.1, ECF 38). The plaintiff did not file a Rule 56 affidavit indicating a need for more discovery

before a motion for summary judgment could be decided, but did note his need for additional discovery in his opposition brief. (ECF 33 at 5, 10 n.1, 20).

## LEGAL STANDARDS

### I. Motion to Dismiss

The defendants move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) all counts against MSP and Trooper Caraballo in his official capacity, and move to dismiss Counts II, VI, and VII—that is, all but the counts related to excessive force—as they relate to Trooper Caraballo in his individual capacity. (ECF 38 at 4 n.1). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

### II. Motion for Summary Judgment

The defendants move to dismiss or, in the alternative, for summary judgment on Counts I, III, IV, and V—in other words, the plaintiff's claim of excessive force under the Fourth Amendment and Maryland Declaration of Rights, and claim of battery under Maryland tort law. (ECF 38 at 4 n.1); *see* (ECF 21 at 1). A court considers only the pleadings when deciding a Rule

12(b)(6) motion. Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551, 556 (D. Md. 2003). "There are two requirements for a proper Rule 12(d) conversion." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Balt.*, 721 F.3d at 281. Here, the plaintiff did not file a Rule 56(d) affidavit, but did note throughout his opposition brief his need to take additional discovery. (ECF 33 at 5, 10 n.1, 20). Thus, the court will consider the video evidence introduced by the defendants to determine whether it is dispositive in resolving their motion for summary judgment, *see Scott v. Harris*, 550 U.S. 372, 380 (2007), but upon determining it is not, the court will deny the motion without prejudice subject to renewal after discovery.

      Under Federal Rule of Civil Procedure 56(a), summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir.

2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court views the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam), and draws all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015).

## ANALYSIS

### I. Claims Against the Maryland State Police

MSP moves to dismiss all the claims against it as barred by the Eleventh Amendment. Under the Eleventh Amendment to the United States Constitution, a state and its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Although the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-201(a) (West), it has not waived its immunity under the Eleventh Amendment to § 1983 suits in federal court, *Ogunsula v. Md. State Police*, No. CV ELH-20-2568, 2021 WL 6105503, at *18 (D. Md. Dec. 23, 2021).[2] "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst*, 465 U.S. at 99. Courts in this District have recognized that MSP is a department of the state of Maryland, *see Ogunsula*, 2021 WL 6105503, at *14–18, and Lewis does

---

[2] Unpublished cases are cited for the soundness of their reasoning, not for precedential value.

not contend otherwise. Thus, the claims against MSP will be dismissed.

## II. Claims Against Trooper Caraballo in his Official Capacity

Trooper Caraballo in his Official Capacity also moves to dismiss under the Eleventh Amendment. "[A] suit lodged against an individual in his or her official capacity is tantamount to suit against the State." *Ogunsula*, 2021 WL 6105503, at *16. As the Supreme Court has explained, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted). Because in this context the Eleventh Amendment bars the suit against MSP, it also bars the suit against Trooper Caraballo in his official capacity. Again, Lewis's opposition brief does not contend otherwise. Thus, the claims against Trooper Caraballo in his official capacity will be dismissed.

In sum, the court grants the motion to dismiss MSP and Trooper Caraballo in his official capacity. The remainder of the analysis applies only to Trooper Caraballo in his personal capacity.

## III. Excessive Force Claims Against Trooper Caraballo in his Individual Capacity

Whether Trooper Caraballo engaged in an excessive use of force is central to all of the plaintiff's claims against him, so the court will first examine Counts I, III, IV, and V of the complaint, the plaintiff's § 1983 claim for excessive use of force in violation of the Fourth and Fourteenth Amendments, his corresponding claim under Articles 24 and 26 of the Maryland Declaration of Rights, and his claim of battery under state tort law. Claims brought under Articles 24 and 26 of the Maryland Declaration of Rights are interpreted as coextensive with their federal analogs, the Fourth and Fourteenth Amendments. *See, e.g.*, *Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010). Further, where "an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the . . . officer's

nonprivileged use of force constitutes battery." *Prince George's Cnty. v. Morales*, 149 A.3d 741, 748 (Md. Ct. Spec. App. 2016) (quoting *French v. Hines*, 957 A.2d 1000, 1037 (Md. Ct. Spec. App. 2008)). Accordingly, in this case the court can analyze the claims under a single standard. Trooper Caraballo moves for summary judgment as to each of the claims related to excessive force.

**A. Excessive Use of Force**

The Fourth Amendment protects citizens from "unreasonable seizures," a protection that includes "prohibit[ing] police officers from using force that is 'excessive' or not 'reasonable' in the course of making an arrest." *Meyers v. Balt. Cnty.*, 713 F.3d 723, 732 (4th Cir. 2013) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)). A police officer's use of force against a subject violates the Fourth Amendment if the officer's actions are not "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal citation omitted). Evaluating the reasonableness of a particular use of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396.

In *Graham*, the Supreme Court specified three non-exhaustive factors for assessing the reasonableness of a particular application of force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. *Id.* Courts judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In doing so, courts "consider the facts at the moment that the challenged force was employed [] with an eye toward the proportionality of the force in light of

all the circumstances." *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)).

Applying the *Graham* factors, the BWC footage suggests that Trooper Caraballo may have been entitled to apply some degree of force, but it is inconclusive as to the extent of force justified. First, Lewis was accused of a serious crime, but nonetheless of a misdemeanor that involved no weapons. *Cf. E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018) ("[A]ssault is an offense that can be considered violent if committed by any person, even a child [but] is tempered [] by the fact that the offense is a misdemeanor[.]"). Second, Lewis was unarmed and the BWC indicates he posed little threat to the broader public. The only threat he posed to the officers prior to their initiating contact was that stemming from his somewhat erratic conduct, his failure to comply with a small number of lawful commands, and two to three instances in which he clenched his fists and made threatening motions toward the officers while they were too far away for Lewis to touch them.[3] After the officers abruptly initiated contact, Lewis struggled in response, but by the time Trooper Caraballo began striking him he was at least partially subdued. Third, Lewis made no attempt to flee, and his resistance may merely have been a natural response to the physical nature of the arrest.

Under these circumstances, Trooper Caraballo may have been entitled to use some degree of force—and he did cease applying force once Lewis was fully handcuffed and completely subdued. Even where officers are "entitled to use some amount of force," however, "the amount of such force [is] constrained by the magnitude of the threat or resistance that [the plaintiff] presented." *Moore v. Peitzmeier*, No. CV TDC-18-2151, 2020 WL 94467, at *7 (D. Md. Jan. 7,

---

[3] There may also be evidence that Lewis had injured his mother and that she did not want him to come back in the house.

2020) (citing *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016)). The Fourth Circuit has recognized that punching a plaintiff "in the back of his head with a closed fist and with great force" may "constitute[] the use of deadly force." *Thomas v. Holly*, 533 F. App'x 208, 218 (4th Cir. 2013). Even where striking an arrestee does not amount to deadly force, continuing to punch a plaintiff after he is subdued is "unreasonable and excessive." *Moore*, 2020 WL 94467, at *9. Thus, *Holly* suggests that Lewis may be able to establish that Trooper Caraballo subjected him to deadly force. Short of that, Lewis may be able to show that Trooper Caraballo's use of force remained disproportionate because he continued punching Lewis in the head after Lewis was subdued or while Lewis was not resisting arrest.

Viewing this evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, there is a genuine dispute of fact as to whether Trooper Caraballo applied a degree of force that exceeded the force necessary to subdue Lewis. This view of the record is not "blatantly contradicted" by the video evidence. *Scott*, 550 U.S. at 380. Instead, the BWC footage the defendants submitted provides "room for a difference of opinion," *Moore*, 2020 WL 94467, at *9 (quoting *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1253 (10th Cir. 2013)). Accordingly, the motion for summary judgment will be denied to permit the plaintiff to take appropriate discovery.

### B. Official Immunity

Trooper Caraballo argues he is immune from suit as to Lewis's § 1983 claim under the doctrine of qualified immunity and as to his state law claims under the Maryland Tort Claims Act.

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages in a § 1983 suit as long as "their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An officer's conduct violates clearly established law "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). When there are "cases of controlling authority in the[] jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority" affirming the allegedly violated right, the law may be clearly established. *Wilson v. Layne*, 526 U.S. 603, 617 (1999). "[T]he 'exact conduct at issue need not' previously have been deemed unlawful for the law governing an officer's actions to be clearly established." *Sims v. Labowitz*, 885 F.3d 254, 262 (4th Cir. 2018) (quoting *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001)).

The Maryland Tort Claims Act grants public officials, including police officers, immunity from suit for tortious acts performed during the course of their public duties. Md. Code Ann., State Gov't § 12-105 (West); Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (West). Such immunity, however, does not protect public officials from suit for acts involving malice or gross negligence. Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). As a general matter, where a genuine dispute of fact exists as to whether an officer used excessive force, a genuine dispute of fact exists as to whether the officer acted with gross negligence as well. *See Stutzman v. Krenik*, 350 F. Supp. 3d 366, 387 (D. Md. 2018). And indeed, issues of malice and gross negligence are questions often best suited for a jury. *See Cooper v. Rodriguez*, 118 A.3d 829, 846 (Md. 2015).

Given the current factual disputes, Lewis may be able to show that Trooper Caraballo's use of force violated clearly established law. The Fourth Circuit's decision in *Holly* made clear that "punching [a pinned down] Plaintiff four or five times in the back of the head with a closed

15

fist and with great force in an effort to arrest him" is an unconstitutional use of excessive force, even where the suspect is continuing to "squirm[] on the ground." *Holly*, 533 F. App'x. at 218-19. Although *Holly* was an unpublished case, the Fourth Circuit recognized that even at the time of the *Holly* decision in 2013, the principle was already clearly established. *Id.* at 219. Moreover, the Fourth Circuit has for decades recognized that assaulting a subdued arrestee after officers have mitigated the immediate threat to themselves is objectively unreasonable. *Moore*, 2020 WL 94467, at *11 (discussing cases). Thus, the factual disputes preclude granting Trooper Caraballo qualified immunity at this stage. Further, the court has concluded that there is a genuine dispute of fact as to whether Trooper Caraballo exercised excessive force; it follows that there is a genuine dispute of fact as to whether he acted with gross negligence. As a result, the Maryland Tort Claims Act likewise does not bar Lewis from seeking discovery on his state law claims.

In sum, the court concludes that taking all the evidence in the light most favorable to Lewis and drawing all reasonable inferences in his favor, he may be able to establish that Trooper Caraballo subjected him to excessive force and is not entitled to official immunity. The video evidence does not conclusively show otherwise. The court will deny without prejudice Trooper Caraballo's individual capacity motion as to Counts I, III, IV, and V, but permit him to renew it following discovery should he so choose.

**IV. Remaining Claims Against Trooper Caraballo in his Individual Capacity**

The complaint alleges three additional claims on top of Lewis's claims related to excessive force: denial of access to the courts and legal redress (Count II); intentional infliction of emotional distress (Count VI); and civil conspiracy (Count VII). The defendants moved to dismiss each of these claims. (*See* ECF 38 at 4 n.1). Lewis's opposition to the defendants' motion, however, does

not address them. "[I]t is customary practice in this Court to deem claims abandoned to the extent a plaintiff fails to respond to a motion to dismiss those claims." *O'Reilly v. Tsottles*, No. CV GLR-18-3622, 2021 WL 424415, at *7 (D. Md. Feb. 8, 2021) (collecting cases). Thus, the court concludes Lewis has abandoned Counts II, VI, and VII and will grant the defendants' motion to dismiss each claim.

## CONCLUSION

For the reasons stated above, the motion to dismiss MSP and Trooper Caraballo in his official capacity will be **GRANTED** in full. Trooper Caraballo's individual capacity motion to dismiss Counts II, VI, and VII will be **GRANTED** and his motion to dismiss or in the alternative for summary judgment on Counts I, III, IV, and V will be **DENIED** without prejudice to renewal of the motion after discovery.

A separate order follows.

_9/29/22_  
Date

_CCB_  
Catherine C. Blake  
United States District Judge